*374 Opinion
JOHNSON, J.
—On September 4, 2013, Pierre Daniel (Daniel), an actor, worked as an extra in a movie entitled, A Haunted House 2 (Open Road Films 2014). Marlon Wayans (Wayans) co-wrote, produced, and starred in the movie. In August 2014, Daniel sued Wayans and others, alleging, inter alia, that he was the victim of racial harassment because during his one day of work on the movie he was compared to a Black cartoon character and called “ ‘[n]igga.’ ” In response, Wayans, pursuant to Code of Civil Procedure[1] section 425.16, moved to strike Daniel’s claims against him as a SLAPP suit (strategic lawsuit against public participation), arguing that all of Daniel’s claims arose from Wayans’s constitutional right of free speech because the core injury-producing conduct arose out of the creation of the movie and its promotion over the Internet. The trial court agreed with Wayans and also found that Daniel had failed to establish the probability that he would prevail on any of his claims against Wayans. As a result, the trial court entered judgment in favor of Wayans and awarded him his attorney fees.
On appeal, Daniel argues that the trial court erred with regard to its determination of the threshold issue in Wayans’s anti-SLAPP motion—that is, the conduct at issue was not part of the “ ‘creative process’ ” inherent in making the movie because it occurred when the cameras were not rolling and, as a result, did not involve the right of free speech or an issue of public interest. In the alternative, Daniel contends that even if the conduct at issue implicated Wayans’s right to free speech, he presented sufficient evidence to the trial court to establish a probability of prevailing. We find both of Daniel’s arguments to be unpersuasive. Accordingly, we affirm the judgment.
BACKGROUND
I. Daniel’s complaint
On August 25, 2014, in an unverified complaint, Daniel alleged that defendants EFS Entertainment, ICM Partners, and IM Global employed him as an actor for A Haunted House 2. He further alleged that Wayans was a manager, officer, shareholder, director, supervisor, managing agent, owner, principal, or employee of all of the other defendants.
The complaint asserted a total of 13 different causes of action, eight of which were asserted against Wayans: a race-based harassment claim brought pursuant to Government Code section 12940 et seq.; a claim alleging a *375 violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.); a claim brought pursuant to Civil Code section 3344 for the unauthorized use of another’s photograph for advertising; a common law misappropriation of likeness claim; a common law “false light’Vinvasion of privacy claim; a common law claim for breach of a quasi-contract; a common law claim for unjust enrichment; and a common law claim for intentional infliction of emotional distress.
Daniel’s claims against Wayans stem from two different but related contexts of alleged misconduct. The first alleged misconduct occurred solely on the movie set (the on-set comments and conduct). Specifically, Daniel alleged that Wayans subjected him to “offensive and derogatory language regarding his race/national origin,” such as repeatedly referring to him “in a demeaning manner, as ‘Nigga,’ a derogatory term and racial slur used to refer to African-Americans”; “repeatedly mocking [Danielj’s ‘afro’ “repeatedly and negatively referring] to [Daniel] as ‘Cleveland Brown,’ an African American cartoon character in the adult cartoon comedy series ‘Family Guy’ routinely leering, staring, and rolling his eyes at Daniel; ridiculing Daniel in the presence of other crew members; and treating Daniel “differently, disparately, and negatively because of his race/national origin, including making demeaning, abusive, and derogatory comments and gestures.”
The second arena or context of alleged misconduct evolved primarily on the Internet (the Internet posting). Specifically, Daniel alleged that Wayans took Daniel’s photograph without his consent and then posted it on the Internet and “Defendants’ websites alongside a photograph of [a] popular African-American cartoon character, ‘Cleveland Brown’ with the inappropriate caption, ‘Tell me this nigga don’t look like . . . THIS NIGGA!!! 01 Cleveland Brown ass lookin @ahhmovie 2 @whatthefunny I’m hurtin!’ ”
II. Wayans’s anti-SLAPP motion
On November 5, 2014, Wayans filed a special motion to strike pursuant to section 425.16. Wayans’s anti-SLAPP motion challenged all causes of action in which he was named. Wayans argued that he met his burden under the anti-SLAPP statute because his creative spark in referring to Daniel as “Cleveland” resulted in the birth of a character in the film; his use of the word nigga, a term liberally used throughout the film, helped advance or assist in the creation of dialogue for the film; and by promoting Daniel in the Internet and Twitter post as a Cleveland Brown look-alike, Wayans helped promote the film. The motion was supported by three declarations: one by Wayans himself; one by the movie’s leading actress, laime Pressly (Pressly); and one by Rick Alvarez (Alvarez), “a producer and cowriter” of both A Haunted House and A Haunted House 2.
*376 A. Wayans’s declaration
In his declaration, Wayans admitted joking with Daniel about his resemblance to the Cleveland Brown cartoon character. Wayans stated he then named the character portrayed by Daniel “Cleveland” and used that name as he improvised dialogue for the scene in which Daniel appeared. Wayans emphasized that on-set improvisation, including “[jjoking around,” constituted a key part of the creative process both in A Haunted House 2 and in his other movies, as the scripts for those movies were often just an “outline of scenes.” To demonstrate the improvisational nature of the movie’s creative process, Wayans submitted the certified transcript of three different “takes” of the scene in which Daniel appeared; in each of those takes the action is the same—Wayans's character calling Daniel’s character to help get a heavy safe off of his dog—but the dialogue is markedly different each time as Wayans experiments or improvises.
Wayans also admitted taking Daniel’s photograph, but declared that Daniel consented and posed for the photograph. Wayans then “juxtaposed the photo with a humorously similar photo of Mr. Daniel’s cartoon look-alike, Cleveland Brown, with the caption” alleged in the complaint and previously quoted herein. Wayans continued: “My reference to ‘@ahhmovie2’ was a link to the Twitter and Instagram pages for A Haunted House 2. My reference to ‘whatthefunny’ is a reference to my website, which posts humorous videos. I then posted the juxtaposed photos and caption to my Twitter account, which at that time had over a million followers.” (Italics omitted.) Wayans stated that Daniel at no time objected or stated he was uncomfortable when Wayans joked with him, took the photo, or posted it.
B. Pressly’s declaration
In her declaration, Pressly stated that she observed Wayans and Daniel interacting on the set and declared that Daniel laughed at Wayans’s joke that Daniel looked like the Cleveland Brown cartoon character and noted that Wayans was so struck by the resemblance that he decided to use Cleveland as the name for Daniel’s character. Pressly further declared that Daniel not only agreed to be photographed by Wayans but posed for the photograph and later joined in the laughter among the cast and crew on the set once the photograph and the image of the Cleveland Brown character were posted to the Internet.
With regard to the creative process for the movie, Pressly affirmed that “[mjany of the scenes in A Haunted House 2 were improvisational in nature,” meaning that “the actors and actresses spontaneously make up jokes as they go along.” On a related note, Pressly stated that much of the comedy in the *377 movie derived from making fun of various stereotypes, including racial stereotypes. As a result, the word nigga was used “dozens of times throughout the movie”; in fact, at one point in the movie Wayans’s character calls Pressly’s character nigga, even though Pressly is Caucasian. In addition, Pressly noted that Wayans has called her “ ‘nigga’ in the past, and frequently uses it as a term of endearment with his friends and family.”
C. Alvarez’s declaration
One of Alvarez’s roles with regard to A Haunted House 2 was to “oversee the entire production of the film.” Alvarez affirmed that Daniel was hired as a nonspeaking extra for the movie and attached to his declaration a copy of a standard union voucher signed by Daniel in connection with his work on the movie (the voucher). The voucher, in part, states that Daniel agreed to give the movie’s production company broad rights with regard to the use of his image: “I hereby grant to the Production Company of The Production, its successors, assignees, licenses or any other person or company who might gain title or rights to the production, the right to photograph me and record my voice to use, alter, dub, edit, and or otherwise change such photographs and recordings, in any manner whatsoever and for any reason in connection with The Production, such right to be worldwide and in perpetuity.”
As with Wayans and Pressly, Alvarez described the creative process for the movie as improvisational: “A Haunted House 2 is an R-Rated comedy. To make the film as funny as possible, much of the dialogue was intended to be, and was, developed on the set through improvisation. The actors were encouraged to improvise, ad lib, and have fun as part of the creative process. Mr. Wayans and the other actors regularly joked amongst themselves and with others on the set to develop dialogue and create an atmosphere that was humorous and conducive to comedy.” (Italics omitted.)
Alvarez, like Pressly, noted that the word nigga, and variants such as “nigger” and “niggie,” are used “dozens of times, throughout the movie as part of the comedy.” Alvarez goes on to note that the movie “includes a scene that specifically explores the idea that the use of the terms ‘nigga’ and ‘nigger’ are sometimes considered socially acceptable for black people to use but not people with other racial backgrounds.” Like Pressly, Alvarez affirmed that Wayans uses the term nigga as a term of endearment, noting that Wayans “has even called [him] ‘nigga’ during the time [they] spent writing together, and [he is] not black.”
III. Daniel’s opposition
Daniel opposed Wayans’s motion, arguing, inter alia, that the anti-SLAPP statute does not reach claims for racial harassment and that there was no *378 “public interest” in the photo of him and the Cleveland Brown character that Wayans posted to the Internet. In addition, he argued that there was sufficient evidence to show a probability of prevailing on each of his claims.
In support of his opposition Daniel submitted a declaration of his own in which he, inter alia, elaborated upon Wayans’s alleged harassment of him on the set. Daniel stated that Wayans first called him Cleveland while he was “waiting off camera to receive [his] acting directions,” when filming was not underway. Wayans also said, “ ‘O’l Cleveland Brown with your afro and thick mustache, you need to shed some pounds.’ ” Wayans then called Daniel a “ ‘black fat ass’ and began laughing at” him. Daniel declared that throughout the day, while he was on break and cameras were not rolling, Wayans repeatedly approached him and called him Cleveland at least 15 more times, looked and pointed at him while saying nigga at least three to four times, called Daniel’s hair an “ ‘Afro’ ” while laughing on at least 10 occasions, called Daniel a “ ‘black fat ass’ ” in the presence of others at least twice, and “continuously” approached Daniel and leered, “sneeringly smile[d],” rolled his eyes, and watched Daniel. Daniel stated that at no time did he laugh when Wayans called him Cleveland and that he found Wayans’s use of nigga when directed at him to be “racially offensive and derogatory.” However, Daniel did not assert that Wayans’s conduct and/or comments on the set adversely affected his work in any way on the movie.
As for the photograph of him that was posted to the Internet, Daniel disputed that he gave his consent and/or laughed about the posting while on the set. According to Daniel, he did not learn of the posting until later that night after he left the set when his brother informed him of the post. When he finally did view the post, Daniel felt “extremely offended.” Because other people besides his brother have called him and approached him to ask if he is “the ‘Cleveland Brown’ character” from the post, Daniel has suffered apprehension when going out in public, nightmares, anxiety, depression, and stress headaches as a result of Wayans’s alleged misconduct.
In his declaration, Daniel did not dispute the improvisational nature of the movie’s creative process, as described by Wayans, Pressly and Alvarez. Nor did he dispute that the signature on the voucher is his. Instead, he objected to the voucher on various evidentiary grounds, including lack of foundation. Daniel did not submit any declarations by any experts or any other members of the cast or crew of A Haunted House 2.
IV. The trial court’s findings
On December 11, 2014, the trial court heard oral argument on the motion. On December 31, 2014, the trial court issued a 17-page ruling, which, inter *379 alia, overruled Daniel’s objection to the voucher and granted Wayans’s motion in its entirety. On January 23, 2015, the trial court entered a judgment in favor of Wayans. On March 13, 2015, the trial court, in accord with the anti-SLAPP statute (§ 425.16, subd. (c)), awarded attorney fees to Wayans in the amount of $96,040. Daniel filed a timely appeal with regard to both the judgment and the award of attorney fees.
DISCUSSION
I. Standard of review
We review an order granting or denying an anti-SLAPP motion de novo. (Oasis West Realty, LLC v. Goldman (2011) 51 Cal.4th 811, 820 [124 Cal.Rptr.3d 256, 250 P.3d 1115].) We consider the “pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.” (§425.16, subd. (b)(2).) We do not “weigh evidence or resolve conflicting factual claims. [Our] inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [We] accept[] the plaintiffs evidence as true, and evaluate[] the defendant’s showing only to determine if it defeats the plaintiff’s claim as a matter of law.” (Baral v. Schnitt (2016) 1 Cal.5th 376, 384-385 [205 Cal.Rptr.3d 475, 376 P.3d 604].)
II. Anti-SLAPP principles
“A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party’s exercise of constitutional rights to free speech and to petition the government for redress of grievances. [Citation.] The Legislature enacted . . . section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights.” (Rusheen v. Cohen (2006) 37 Cal.4th 1048, 1055-1056 [39 Cal.Rptr.3d 516, 128 P.3d 713].)
To determine whether a lawsuit or cause of action should be disposed of as a SLAPP suit, section 425.16 establishes a two-part test. “First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§425.16, subd. (b)(1).) ‘A defendant meets this burden by demonstrating that the act underlying the plaintiff’s cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e) . . . .’ ” (Navellier v. Sletten (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].) A cause of action arises from protected activity if “the defendant’s acts underpinning the plaintiff’s cause of action involve [s] an exercise of the right of petition or free speech.” (Gerbosi v. Gaims, Weil, West & Epstein, LLP (2011) 193 Cal.App.4th 435, 443 [122 Cal.Rptr.3d 73].)
*380 If the defendant makes this showing, the court proceeds to the second step of the anti-SLAPP analysis. (Navellier v. Sletten, supra, 29 Cal.4th at p. 88.) In the second step, the court decides whether the plaintiff has demonstrated a reasonable probability of prevailing at trial on the merits of its challenged causes of action. (Ibid.) Conversely, if the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step. “Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.” (Id. at p. 89, italics omitted.)
III. Step one: Wayans met his burden
Under the two-step process applicable to anti-SLAPP motions, we must first determine whether Wayans made a threshold showing that Daniel’s claims arise from a protected activity.
A. Wayans’s burden
In assessing whether a cause of action arises from protected activity, “ ‘we disregard the labeling of the claim [citation] and instead “examine the principal thrust or gravamen of a plaintiffs cause of action [Citation.] We assess the principal thrust by identifying “[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.” [Citation.] If the core injury-producing conduct upon which the plaintiffs claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute.’ ” (Tuszynska v. Cunningham (2011) 199 Cal.App.4th 257, 267 [131 Cal.Rptr.3d 63].) “[T]he critical point is whether the plaintiff’s cause of action itself was based on an act in furtherance of the defendant’s right of petition or free speech.” (City of Cotati v. Cashman (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P3d 695].) “In other words, ‘the defendant’s act underlying the plaintiff’s cause of action must itself have been an act in furtherance of the right of petition or free speech.’ ” (Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP (2005) 133 Cal.App.4th 658, 670 [35 Cal.Rptr.3d 31].)
When evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, “courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. ‘[C]auses of action do not arise from motives; they arise from acts.’ ” (People ex rel. Fire Ins. Exchange v. Anapol (2012) 211 Cal.App.4th 809, 823 [150 Cal.Rptr.3d 224].) “ ‘The court reviews the parties’ pleadings, declarations and other supporting documents to determine *381 what conduct is actually being challenged, not to determine whether the conduct is actionable.’ ” (Id. at p. 822.)
A defendant need only make a prima facie showing that the plaintiffs claims arise from protected activity. (Mundy v. Lenc (2012) 203 Cal.App.4th 1401, 1408 [138 Cal.Rptr.3d 464]; People ex rel. Fire Ins. Exchange v. Anapol, supra, 211 Cal.App.4th at p. 822.) “The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law.” (Fox Searchlight Pictures, Inc. v. Paladino (2001) 89 Cal.App.4th 294, 305 [106 Cal.Rptr.2d 906].) “Instead, under the statutory scheme, a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens.” (Chavez v. Mendoza (2001) 94 Cal.App.4th 1083, 1089 [114 Cal.Rptr.2d 825], italics added; see City of Los Angeles v. Animal Defense League (2006) 135 Cal.App.4th 606, 621 [37 Cal.Rptr.3d 632].)
Daniel argues that Wayans’s conduct necessarily falls outside the protections of the anti-SLAPP statute because the gravamen of his complaint is race-based harassment and such conduct is not a protected activity. We are unpersuaded by Daniel’s argument because the exercise of free speech here was central, not incidental, to his alleged injuries. (See Nam v. Regents of University of California (2016) 1 Cal.App.5th 1176, 1190 [205 Cal.Rptr.3d 687] (Nam) [“protected activity that is incidental to a cause of action [does not] justify an anti-SLAPP dismissal”]; see also Hunter v. CBS Broadcasting Inc. (2013) 221 Cal.App.4th 1510, 1521, 1525 [165 Cal.Rptr.3d 123].)
The distinction between communicative conduct that is central versus that which is incidental to the exercise of the right to petition or the right of free speech is illustrated by the two cases upon which Daniel relies: Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartmen ts, LLC (2007) 154 Cal.App.4th 1273 [65 Cal.Rptr.3d 469] (Department of Housing); Martin v. Inland Empire Utilities Agency (2011) 198 Cal.App.4th 611 [130 Cal.Rptr.3d 410] (Martin). In both Department of Housing and Martin, the alleged injury-producing conduct was acts of discrimination largely, if not completely, untethered to the exercise of the defendant’s free speech/petitioning rights.
In Department of Housing, supra, 154 Cal.App.4th 1273, the trial court denied the defendant’s anti-SLAPP motion and the Court of Appeal affirmed because, although the complaint discussed in detail a number of communications, those communications were not the source of the alleged injury. Rather, *382 “the allegations of wrongdoing in [the Department of Fair Employment & Housing’s] complaint arose from [the landlord]’s alleged acts of failing to accommodate [the tenant]’s disability.” (Id. at p. 1284.)
In Martin, supra, 198 Cal.App.4th 611, the court found the employee’s claims for discrimination and retaliation against his former employer were not based on protected activity, because although the complaint contained some references to protected activity—namely, poor performance reviews and a discussion of plaintiff’s performance during a board meeting—those references were “mentioned only minimally in plaintiff’s pleadings.” (Id. at p. 625.) Instead, the focus of plaintiff’s claims was the harassing and retaliatory acts by plaintiff’s supervisor (e.g., “he hired plaintiff’s employees without his input, restructured plaintiff’s division, and announced the latter decision in a manner allegedly meant to disgrace him”), none of which were based on the rights of petition or free speech. (Id. at p. 624.)
Similarly, in the more recent decision in Nam, supra, 1 Cal.App.5th 1176, the core conduct at issue did not implicate defendant’s petition or free speech rights. In Nam, while there was some allegedly protected activity (the defendant’s disciplinary process and related communications), the gravamen of plaintiff’s complaint focused on defendant’s acts of “retaliation for her public challenge of department policies and her rejection of [a supervisor’s] inappropriate overtures.” (Id. at p. 1192.) Accordingly, the Court of Appeal affirmed the denial of defendant’s anti-SLAPP motion because “the basis of [plaintiff’s] claim, as in [Department of Housing, supra, 154 Cal.App.4th 1273] and Martin[, supra, 198 Cal.App.4th 611] was defendant’s retaliation,” not the defendant’s exercise of its petition or free speech rights. (Nam, at p. 1193.)
Here, in contrast (and as discussed in more detail below), the gravamen of Daniel’s complaint stems not from any conduct incidental to Wayans’s free speech rights; rather, all of the alleged misconduct is based squarely on Wayans’s exercise of free speech—the creation and promotion of a full-length motion picture, including the off-camera creative process. As such, Daniel’s complaint is subject to an anti-SLAPP motion.
B. The acts at issue arose out of protected activity
Section 425.16, subdivision (e) sets forth four categories of protected activity. Wayans contends that the conduct underlying Daniel’s claims falls within section 425.16, subdivision (e)(3) and (4), which defines protected activity to include the following: “(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.” As discussed below, we agree with Wayans.
*383 As noted above, the acts at issue fall into two basic categories: the on-set comments and conduct and the Internet posting. We discuss each in turn.
1. The on-set comments and conduct
The allegedly harassing and offensive conduct and comments by Wayans on the set of A Haunted House 2 were made in furtherance of his constitutional right of free speech in connection with an issue of public interest. (§ 425.16, subd. (e)(4).)
a. Free speech
Movies and films generally are considered “expressive works” subject to First Amendment protections. (Guglielmi v. Spelling-Goldberg Productions (1979) 25 Cal.3d 860, 871 [160 Cal.Rptr. 352, 603 P.2d 454].) Movies are a “significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform.” (Joseph Burstyn, Inc. v. Wilson (1952) 343 U.S. 495, 501 [96 L.Ed. 1098, 72 S.Ct. 777], fn. omitted.) Whether exhibited in theaters or on television, a him is a medium which is protected by the constitutional guarantees of free expression. (U.S. Const., 1st & 14th Amends.; Cal. Const., art. I, § 2; Joseph Burstyn, Inc., at pp. 501-502; Red Lion Broadcasting Co. v. FCC (1969) 395 U.S. 367, 386-390 [23 L.Ed.2d 371, 89 S.Ct. 1794].) Nor do films and movies lose their constitutional protection because they are undertaken to generate a proht. (Guglielmi v. Spelling-Goldberg Productions, at pp. 867-868.) In short, “it is beyond dispute that movies involve free speech.” (Dyer v. Childress (2007) 147 Cal.App.4th 1273, 1280 [55 Cal.Rptr.3d 544].) Because a him is an expressive work, its creation is also an exercise of free speech. (See Tamkin v. CBS Broadcasting, Inc. (2011) 193 Cal.App.4th 133, 143 [122 Cal.Rptr.3d 264] [creating, casting and broadcasting TV episode is exercise of free speech].)
Although it is undisputed that the conduct and comments at issue were made on the set of A Haunted House 2, Daniel argues that they were not made in furtherance of Wayans’s free speech rights because they occurred “during breaks, while no cameras were rolling.” Daniel’s argument is unavailing for several reasons.
First, Daniel’s argument that the movie’s creative process occurred only when the cameras were rolling rests on an unreasonably narrow or constrained view of the creative process generally. “As stated in a different *384 context, ‘[t]he creative process [for a raunchy comedy] must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried, and, in the end, either discarded or used. ... [¶] ... We must not permit juries to dissect the creative process in order to determine what was necessary to achieve the final product and what was not, and to impose liability ... for that portion deemed unnecessary. Creativity is, by its nature, creative. It is unpredictable. Much that is not obvious can be necessary to the creative process.’ ” (Tamkin v. CBS Broadcasting, Inc., supra, 193 Cal.App.4th at pp. 144-145, quoting Lyle v. Warner Brothers Television Productions (2006) 38 Cal.4th 264, 298 [42 Cal.Rptr.3d 2, 132 P.3d 211] (cone. opn. of Chin, J.) (Lyle) [addressing workplace sexual harassment claim];[2] Brodeur v. Atlas Entertainment, Inc. (2016) 248 Cal.App.4th 665, 677 [204 Cal.Rptr.3d 483] [declining “ ‘ “to dissect the creative process” ’ ” and affirming granting anti-SLAPP].)
Second, Daniel’s argument about the boundaries of the creative process for A Haunted House 2—it only occurs on-set when the camera is rolling—is flatly contradicted by the undisputed testimony offered by Wayans, Pressly and Alvarez, who affirmed that the creative process for A Haunted House 2 *385 was highly improvisational in nature and occurred when the camera was rolling and when it was not. As Wayans explained, ‘“[j]oking around on set is part of my creative process for making a comedy film.” According to Pressly, it is ‘“important” on the set of any comedy to have a ‘“light, funny atmosphere,” and on the set of A Haunted House 2 ‘“[e]veryone . . . joked around with each other as part of the creative process.”
The improvisational nature of the creative process for the movie is amply demonstrated in the widely varying dialogue that was used in the three outtakes and in the final version of the scene in which Daniel appears. In fact, Daniel’s contention that Wayans’s comments and conduct when the camera was rolling was completely divorced from his comments and conduct when the cameras were not rolling is flatly belied by those outtakes. For example, Daniel contends that during breaks when the cameras were not rolling Wayans made disparaging comments about Daniel’s hair—‘“Throughout the day, at least ten times, Wayans called my hair an ‘Afro’ and would start laughing.” However, in one of the outtakes, Wayans’s character commented repeatedly on the hair of Daniel’s character, promising to get Daniel’s character a ‘“perm ... a nice moist [Jheri] curl”[3] if he will help Wayans’s character move the safe off his dog. In addition, the name given to Daniel’s character, Cleveland was also born from the creative process that occurred when the cameras were not rolling—Wayans’s noticing and commenting on Daniel’s resemblance to the cartoon character. In other words, the evidence shows a direct linkage between the allegedly injury-producing off-camera comments and the film’s creative process.
Third, Daniel’s argument is bereft of any supporting evidence. Daniel does not offer any testimony or documents rebutting the testimony by Wayans, Pressly, and Alvarez about the creative process for A Haunted House 2. There is, in other words, no evidence showing or even suggesting that the creative process for A Haunted House 2 ceased when the cameras stopped rolling.
In short, an act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right. (See Lieberman v. KCOP Television, Inc. (2003) 110 Cal.App.4th 156, 166 [1 Cal.Rptr.3d 536] [““Furtherance means helping to advance, assisting.”].) Here, the testimony and documentary evidence submitted by Wayans regarding the movie’s creative process—which was uncontradicted by Daniel— *386 established that the on-set comments and conduct were done to assist Wayans in the exercise of his right to free speech—that is, to make A Haunted House 2.
b. Issue of public interest
The term “issue of public interest” is construed broadly in the anti-SLAPP context. (Hecimovich v. Encinal School Parent Teacher Organization (2012) 203 Cal.App.4th 450, 464 [137 Cal.Rptr.3d 455].) An issue of public interest is “any issue in which the public is interested.” (Nygard, Inc. v. Uusi-Kerttula (2008) 159 Cal.App.4th 1027, 1042 [72 Cal.Rptr.3d 210], italics omitted.) The issue does not need to be “ ‘significant’ ” to be covered by the anti-SLAPP statute. (Ibid.) For example, in Hecimovich, a California appellate court determined that a dispute between a fourth grade basketball coach and members of a parent teacher organization regarding parental complaints about the plaintiffs abrasive coaching style constituted an issue of public interest because “the safety of children in sports” is an issue of public interest, the “suitability of [the plaintiffs] coaching style was a matter of public interest among the parents,” and “problem coaches/problem parents in youth sports” is an issue of public interest. (Hecimovich, at pp. 467-468.) With regard to entertainment, California courts have found that there is a public interest within the meaning of the anti-SLAPP statute “in the writing, casting and broadcasting” of an episode of a popular television program. (Tamkin v. CBS Broadcasting, Inc., supra, 193 Cal.App.4th at p. 144.)
Here, Wayans submitted evidence that the making of A Haunted House 2 was an issue of public interest. Wayans is a popular and prolific entertainer— since 1988, Wayans has acted in 21 films; since 1991, he has acted in 13 different television shows, specials, or movies; since 1992, he has written or co-written 16 different films and/or television movies or shows; and since 1996, he has produced or served as an executive producer of 13 different films and/or television movies or shows. The longevity and breadth of Wayans’s career demonstrate continuing public interest in his work. In addition, many of Wayans’s projects “involve making fun of pop culture, racial stereotypes, [and] current events,” adding to the public’s interest in his work. In light of Wayans’s extensive body of work and the subject matter of that work, A Haunted House 2 falls easily within the anti-SLAPP statute’s definition of an “issue of public interest.”[4]
*387 In sum, Wayans met his burden of making a prima facie showing that the on-set comments and conduct fell within the definition of protected activity set forth in section 425.16, subdivision (e)(4).
The dissenting opinion describes a parade of horribles that the majority opinion would unleash. But these horribles are not before us. And in any case, we agree that the examples described by the dissent would not be in furtherance of the right of free speech. Here, we only hold that Wayans’s conduct, including calling Daniel nigga during the creative process of molding a theatrical work, is protected by free speech.
2. The Internet posting
The allegedly harassing and offensive Internet posting was a writing made in a place open to the public or a public forum and it was made in connection with an issue of public interest. (§ 425.16, subd. (e)(3).)
a. Statement made in a public forum
‘“[0]ur Supreme Court has held that public access, not the right to public comment, is the hallmark of a public forum: ‘Web sites accessible to the public ... are “public forums ” for purposes of the anti-SLAPP statute.’ ” (Nygard, Inc. v. Uusi-Kerttula, supra, 159 Cal.App.4th at p. 1039, some italics added.)
Here, both Daniel’s and Wayans’s declarations state that the juxtaposed pictures of Daniel and the Cleveland Brown cartoon figure and the accompanying caption were posted to Wayans’s Twitter account, which had over a million followers. The Twitter account constitutes a publicly accessible social media forum. Indeed, according to Daniel’s declaration, both he and his brother saw the Twitter post online. Accordingly, the Internet posting was a statement made in a public forum.
b. Issue of public in terest
Although “not every Web site post involves a public issue” (D.C. v. R.R. (2010) 182 Cal.App.4th 1190, 1226 [106 Cal.Rptr.3d 399]), the bar for an anti-SLAPP defendant to overcome is not a particularly demanding one. In Kronemyer v. Internet Movie Database Inc. (2007) 150 Cal.App.4th 941 [59 Cal.Rptr.3d 48], the mere listing of producer credits for a movie on defendant’s website was found to be “an act in furtherance of the right of free speech protected under the anti-SLAPP statute.” (Id. at p. 947.)
Here, the posting at issue references a Twitter account that had more than one million followers (and, per Wayans’s declaration, an Instagram account) *388 for the movie A Haunted House 2, as well as Wayans’s Whatthefunny website. As noted above, Wayans is a popular actor, writer, and producer with many films and television shows to his credit. Moreover, A Haunted House 2 was a sequel to A Haunted House (IM Global Octane 2013), which apparently was sufficiently popular and profitable to lead to financing and production of a sequel. According to Wayans’s declaration, when A Haunted House 2 was released, it played in 2,310 theaters and grossed $8.8 million in its first week.
Accordingly, advance information from Wayans about the making of A Haunted House 2, including a photo of someone acting in the film, constitutes a topic of public interest, even though Daniel himself may not have been known to the public.[5] The post both referred to a topic of widespread public interest (the film) and contributed to the public “debate” or discussion regarding the film by giving fans and those interested a glimpse of someone in the film. We therefore conclude that the Internet posting constituted protected activity as provided in section 425.16, subdivision (e)(3).
IV. Step two: Daniel did not meet his burden
In the second step of an anti-SLAPP analysis, we determine whether plaintiff has produced evidence demonstrating a probability of prevailing on his claims.
To show a probability of prevailing on his claims, “ ‘the plaintiff “must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.” [Citations.] . . . [T]hough the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant’s evidence supporting the motion defeats the plaintiff’s attempt to establish evidentiary support for the claim.’ ” (Taus v. Loftus (2007) 40 Cal.4th 683, 713-714 [54 Cal.Rptr.3d 775, 151 P.3d 1185].) “ ‘The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.’ ” (Paiva v. Nichols (2008) 168 Cal.App.4th 1007, 1017 [85 Cal.Rptr.3d 838].)
*389 Here, we conclude that Daniel did not meet his burden with respect to any of his claims against Wayans.[6]
A. Racial harassment
Daniel’s racial harassment claim against Wayans (first cause of action) is brought pursuant to the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.). Although federal court rulings are not binding on the Court of Appeal, California courts “frequently turn to federal authorities interpreting Title VII of the Civil Rights Act of 1964 . . . for assistance in interpreting the FEHA . . . .” (Miller v. Department of Corrections (2005) 36 Cal.4th 446, 463 [30 Cal.Rptr.3d 797, 115 P.3d 77]; see Mitchell v. State Dept. of Public Health (2016) 1 Cal.App.5th 1000, 1009, fn. 4 [205 Cal.Rptr.3d 261].)
In his complaint, Daniel alleges that while on the set of A Haunted House 2 he was subjected to a racially hostile work environment. “To establish a prima facie case of a racially hostile work environment, [a plaintiff is] required to show that (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the [defendant] is liable for the harassment.” (Thompson v. City of Monrovia (2010) 186 Cal.App.4th 860, 876 [112 Cal.Rptr.3d 377].)
To establish the fourth element—that the harassment created a hostile work environment—a plaintiff “ ‘must prove that the defendant’s conduct would have interfered with a reasonable employee’s work performance and would have seriously affected the psychological well-being of a reasonable employee ....’” (Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 130-131 [87 Cal.Rptr.2d 132, 980 P.2d 846].) Harassment, which may be verbal, physical, or visual and “communicates an offensive message to the harassed employee” (Roby v. McKesson Corp. (2009) 47 Cal.4th 686, 706 [101 Cal.Rptr.3d 773, 2Í9 P.3d 749]), “ ‘cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature.’ ” (Aguilar, at p. 131.) Whether the harassment is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive environment “must be assessed from the ‘perspective of a reasonable *390 person belonging to the racial or ethnic group of the plaintiff.’ ” (Nazir v. United Airlines, Inc. (2009) 178 Cal.App.4th 243, 263-264 [100 Cal.Rptr.3d 296].) In addition, determining whether an environment is hostile requires looking at the totality of the circumstances, including “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” (Harris v. Forklift Systems, Inc. (1993) 510 U.S. 17, 23 [126 L.Ed.2d 295, 114 S.Ct. 367].)
Daniel relies upon Dee v. Vintage Petroleum, Inc. (2003) 106 Cal.App.4th 30 [129 Cal.Rptr.2d 923], for his assertion that “a single racial slur by a supervisor may also create a hostile work environment.” (Id. at p. 36.) Dee involved much more than a single racial slur. The plaintiff’s supervisor “called her a ‘bitch’ and ‘constantly’ used the word ‘asshole.’ He berated her, ‘harassed’ her, ordered her to lie and blamed her for tasks he ordered her to perform.” (Id. at p. 37.) After the plaintiff complained to her supervisor about being asked to lie, the supervisor told the plaintiff that “ ‘it is your Filipino understanding versus mine.’ ” {Ibid.) This comment was, as the Court of Appeal stated, “an ethnic slur, both abusive and hostile.” {Ibid.) The court concluded that the evidence supported a reasonable inference that “the racial slur was not an isolated event” and that the supervisor “wished to intimidate [the plaintiff] so that she would not complain to higher management about his conduct.” {Ibid.) The court did not hold, as Daniel asserts, that “a single racial slur by a supervisor may also create a hostile work environment.” Although the Dee court made this statement, it preceded it with the phrase, ”[i]n other jurisdictions.” {Id. at p. 36, italics added, citing Rodgers v. Western-Southern Life Ins. Co. (7th Cir. 1993) 12 F.3d 668, 675 (Rodgers).) Dee cannot be read as Daniel urges.
Daniel argues on appeal that “ ‘It is beyond question that the use of the word “nigger” is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is “perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry.” ’ ” We agree with our Supreme Court that although “ ‘nigger’ may once have been in common usage,” it is now considered to be “particularly abusive and insulting ... as it pertains to the American Negro.” (Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 498, fn. 4 [86 Cal.Rptr. 88, 468 P.2d 216].)
Nigger, however, is not the term at issue here. Rather, the term at issue is nigga. As Daniel makes clear in his declaration opposing the motion, he was not called nigger by Wayans, but nigga. Nigga is not an unambiguous racial epithet in today’s world, especially when used intraracially, as it was here. In fact, one noted legal scholar, Harvard Eaw professor, Randall Kennedy has *391 observed that “ ‘[today,] when African Americans are speaking to each other, “nigger,” and especially its more genial cousin, “nigga” can be an affectionate greeting, a compliment, or a term of respect.’ ” (Perdu and Parks, The Nth Decree: Examining Intraracial Use of the N-word in Employment Discrimination Cases (2014) 64 DePaul L.Rev. 65, 67; see Kennedy, Nigger: The Strange Career of a Troublesome Word (2002) p. 5 [“Currently, some people insist upon distinguishing nigger—which they see as exclusively an insult— from nigga, which they view as a term capable of signaling a friendly salutation.”].[7])
Wayans introduced evidence that nigga as used by him—generally and on the set of A Haunted House 2—and as received by others working on the movie was not a racial slur, but a term of endearment. In rebuttal, Daniel stated that, regardless of how others found Wayans’s use of the term, he found the term personally offensive when directed at him. But Daniel limited his rebuttal to only his subjective perspective. In other words, Daniel did not introduce any evidence showing that an objectively reasonable Black actor in his situation would also find the term offensive such that its usage would unreasonably interfere with his work performance. Under the law that is not a sufficient showing. (See Hope v. California Youth Authority (2005) 134 Cal.App.4th 577, 588 [36 Cal.Rptr.3d 154] [“harassment must satisfy an objective and a subjective standard” (italics added)].)
Moreover, the evidence introduced below suggests the contrary to Daniel’s claim—that is, a reasonable Black actor who voluntarily agreed to participate in a movie addressing racial stereotypes that was written, produced and *392 starred Wayans—an artist known for his frequent use of both nigger and nigga in his work[8]—would be on notice that potentially racially charged language would be used in the film, and, given the improvisational nature of the production, that such language might be used among the actors and production staff when the cameras were not rolling to help develop storylines and dialogue. Consequently, under the facts of this case the use of the term nigga did not create a “ ‘hostile or abusive work environment.’ ” (Aguilar v. Avis Rent A Car System, Inc., supra, 21 Cal.4th at p. 130.)
The doubts about Daniel’s ability to prevail on his racial harassment claim are raised to a fatal level when he fails to mention, let alone discuss, how the use of the allegedly offensive language adversely affected him in his work for the movie and would have affected a reasonable Black actor’s performance. Although Daniel states that Wayans’s alleged harassment made him feel “self-conscious, insecure,” “humiliated,” and “embarrassed” while he was on the set, his declaration is completely and tellingly silent with regard to how Wayans’s on-set comments and conduct adversely affected his work performance that day. None of the other declarants who were on the set that day—Wayans, Pressly, and Alvarez—observed Daniel having any trouble in performing his duties. None of the declarants, including Daniel himself, states, for example, that his scene had to be reshot and/or delayed in being shot because Daniel was plainly troubled by something that occurred when the cameras were not rolling and, as a result, he was unable to get into character and/or perform his role in an efficient and effective manner. The only reasonable conclusion that can be drawn from such silence is that the alleged racial harassment had no adverse effect on Daniel’s work performance.[9]
*393 In sum, looking, as we must, at the totality of the circumstances, the alleged acts of racial harassment here did not alter the conditions of Daniel’s employment and create an abusive environment. Even when we credit Daniel’s evidence, that evidence is insufficient as a matter of law to sustain a judgment favorable to him. Accordingly, we hold that the trial court properly struck Daniel’s racial harassment claim against Wayans.
B. Misappropriation
Daniel’s claims for statutory and common law misappropriation of name and likeness (fifth and sixth causes of action) are based solely on the Internet posting. Daniel failed to meet his burden of showing a probability of prevailing with respect to these claims for two reasons: first, Daniel failed to overcome evidence that he waived his claims when he signed the voucher, which contained a broad release consenting to the use of his image in connection with the movie; second, even if Daniel did not release his claims or the voucher was inadmissible, Wayans’s transformative use of Daniel’s photograph established a complete defense.
1. The voucher
An essential element for either a common law or statutory misappropriation claim is the unauthorized use of plaintiff’s image. (See Kirby v. Sega of American, Inc. (2006) 144 Cal.App.4th 47, 55 [50 Cal.Rptr.3d 607] [common law misappropriation claim]; Montana v. San Jose Mercury News, Inc. (1995) 34 Cal.App.4th 790, 793 [40 Cal.Rptr.2d 639] [statutory misappropriation claim].) As discussed above, the voucher contains a broad release regarding the use of Daniel’s image “in any manner whatsoever and for any reason in connection with The Production.” (Italics added.)
On appeal, Daniel makes two related arguments: (a) the trial court improperly overruled his objection to the voucher on authentication grounds; and (b) the voucher does not establish that the release runs in favor of Wayans. We do not find either argument to have merit.
a. The trial court did not err by overruling Daniel's authentication objection to the voucher
“Evidentiary challenges [on an anti-SLAPP motion] are reviewed only for abuse of discretion. [Citation.] As such, we will not overturn an evidentiary ruling on appeal unless ‘the trial court exceeded the bounds of reason, all of *394 the circumstances before it being considered.’ ” (Public Employees’ Retirement System v. Moody’s Investors Service, Inc. (2014) 226 Cal.App.4th 643, 683 [172 Cal.Rptr.3d 238].)
“[W]hile all writings must be authenticated before they are received into evidence ([Evid. Code,] § 1401), the proponent’s burden of producing evidence to show authenticity ([Evid. Code,] § 1400) is met ‘when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]’ [Citation.] The author’s testimony is not required to authenticate a document ([Evid. Code,] § 1411); instead, its authenticity may be established by the contents of the writing ([Evid. Code,] § 1421) or by other means ([Evid. Code,] § 1410 [no restriction on ‘the means by which a writing may be authenticated’]). ‘As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document’s weight as evidence, not its admissibility. [Citations.]’ [Citation.] ‘ “[L]ike any other material fact, the authenticity of a [document] may be established by circumstantial evidence. . . .” ’ ” (People v. Valdez (2011) 201 Cal.App.4th 1429, 1435 [135 Cal.Rptr.3d 628].)
Here, Wayans presented sufficient circumstantial evidence for the trial court to find that the document had been authenticated. As discussed above, the voucher was attached as an exhibit to Alvarez’s declaration. The voucher indicates that the production or project name is “Dumb Ass Prod.,” not A Haunted House 2. However, Alvarez stated in his declaration that the “production company for A Haunted House 2 was Dumb Ass Productions, which is why that company is listed on the [voucher].” (Italics omitted.) In addition, Alvarez indicated in his declaration that he was in a position to have personal knowledge of the corporate entities involved in the making of the movie, as well as the vouchers used with extras, such as Daniel, and Daniel’s execution of the voucher. Alvarez states that as the coproducer of the movie he was responsible for “oversee[ing] the entire production.” (Italics added.) In addition, Alvarez states he was “on the set the one day that Mr. Daniel was on the set and was present during the shooting of the scene in which Mr. Daniel appeared.”
From the facts in Alvarez’s declaration, it can be readily inferred that the voucher was a true and accurate copy of the document that Daniel signed allowing him to be present on the set of A Haunted House 2 and to work as an extra on that movie on September 4, 2013. (Daniel does not dispute that he signed the voucher or that the voucher contains his address, phone number and redacted social security number.) Accordingly, the trial court, considering all of the facts before it, did not exceed the bounds of reason by overruling Daniel’s objection.
*395 b. The voucher’s release extends to Wayans
Daniel asserts that there is “nothing in this record to demonstrate that Wayans was entitled to the benefit of the contract between Daniel and Dumb Ass Productions.” Daniel’s assertion is incorrect. As discussed above, Alvarez states in his declaration that Dumb Ass Productions is the production company responsible for making A Haunted House 2. Both Alvarez and Wayans identify Wayans as one of the movie’s coproducers. Those two undisputed facts are sufficient for purposes of an anti-SLAPP motion to show that the voucher’s broad release includes Wayans.
2. Wayans’s use of Daniel’s image was transformative
The freedom of expression protected by the First Amendment exists to preserve an uninhibited marketplace of ideas and to further individual rights of self-expression. (Winter v. DC Comics (2003) 30 Cal.4th 881, 887 [134 Cal.Rptr.2d 634, 69 P.3d 473] (Winter).) The protections may extend to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, and entertainment, whether or not sold for a profit. (Comedy III Productions, Inc. v. Gary Saderup, Inc. (2001) 25 Cal.4th 387, 406 [106 Cal.Rptr.2d 126, 21 P.3d 797] (Comedy III).)
In Comedy III, supra, 25 Cal.4th 387 and again in Winter, supra, 30 Cal.4th 881, our Supreme Court addressed the balance between an individual’s right to control the commercial exploitation of his or her likeness or identity and the First Amendment right of free expression. (See Comedy III, at p. 400; Winter, at pp. 887-888.) In Comedy III, the court held a defendant may raise the First Amendment as an affirmative defense to an allegation of appropriation if the defendant’s work “ ‘adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . .’ ” (Comedy III, at p. 404.) In other words, the new work must contain significant “transformative elements.” (Id. at pp. 406-407.)
The transformative test is straightforward: The “inquiry is whether the celebrity likeness is one of the ‘raw materials’ from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question.” (Comedy III, supra, 25 Cal.4th at p. 406.) If the “product containing the celebrity’s likeness is so transformed that it has become primarily the defendant’s own expression” of what he or she is trying to create or portray, rather than the celebrity’s likeness, it is protected. (Id. at pp. 406-407.) In developing the test, the Comedy III court made two important observations. First, the right to control one’s image “cannot, consistent with the First Amendment, be a right to control the . . . image by censoring disagreeable portrayals. . . . [T]he First *396 Amendment dictates that the right to comment on, parody, lampoon, and make other expressive uses of the celebrity image must be given broad scope.” {Id. at p. 403.) Second, ‘“in determining whether the work is transformative, courts are not to be concerned with the quality of the artistic contribution—vulgar forms of expression fully qualify for First Amendment protection.” {Id. at p. 407.) In short, all that is necessary is that the defendant’s work add “ ‘something new, with a further purpose or different character, altering the first with new expression, meaning, or message.’ ” {Id. at p. 404.) A work is transformative if it adds “ ‘new expression.’ ” {Ibid.) That expression alone is sufficient; it need not convey any “ ‘meaning ... or message.’ ” {Ibid.)
Applying this test in Comedy III, supra, 25 Cal.4th 387, which involved drawings depicting The Three Stooges, and T-shirts made from those drawings, the court concluded the drawings and T-shirts were not entitled to First Amendment protection. The artist who created them, while highly skilled, contributed nothing other than a trivial variation that transformed the drawings from literal likenesses of the three actors. {Id. at pp. 408^-09.)
The Supreme Court applied the transformative test again two years later in Winter, supra, 30 Cal.4th 881. In that case, the defendant published a series of confies featuring two half-worm, half-human characters based on singers Edgar and Johnny Winter. Both characters had long white hair and albino features similar to the Winter brothers, while one wore a hat similar to one often worn by Johnny Winter. {Id. at p. 886.) The Winter brothers sued for statutory appropriation and lost on summary judgment. The Court of Appeal affirmed in part, reversed in part, and remanded. The Supreme Court, however, granted review. Applying the transformative test, the court found for the defendants, holding that the comic depictions contained significant expressive content beyond the Winters’ mere likenesses and were ‘“entitled to First Amendment protection.” (Id. at pp. 890, 892.) As the Supreme Court explained, the Winters were merely part of the raw material from which the confies’ plot and characters were fashioned. In addition, the characters were distorted pictures of the Winters for the purpose of lampoon, parody or caricature. In short, and in stark contrast to the near literal depictions of the Three Stooges in Comedy III, supra, 25 Cal.4th 387, the comic book characters depicted were ‘“fanciful, creative characters, not pictures of the Winter brothers.” (Winter, at p. 892.)
Here, although Wayans used two unaltered images—one of Daniel and one of the Cleveland Brown character—his use of those images was nonetheless transformative. Wayans’s use was transformative in the combination of the juxtaposed images with his commentary. That combination of images and arguably humorous commentary provided the Internet posting with an element of caricature, lampoon, or parody. It is this element that puts the *397 Internet posting within the protection of the First Amendment. In other words, Wayans’s juxtaposition of Daniel’s image with the image of the Cleveland Brown character and his caption added “ ‘something new’ ” to Daniel’s image, altering it with a “ ‘new expression, meaning, or message.’ ” (Comedy III, supra, 25 Cal.4th at p. 404.)
In sum, because the voucher was authenticated and because its release is not only broad but can reasonably be read to extend to Wayans, Daniel failed to show a probability of prevailing. Alternatively, even if the voucher had not been authenticated, or the evidence was insufficient to show that its release extended to Wayans, the Internet posting was a transformative use of Daniel’s image and, as a result, Wayans has an affirmative defense to Daniel’s misappropriation claims. In fight of the voucher’s release and the Internet posting’s transformative use, the trial court properly struck the misappropriation claims.
C. False light
“ ‘One who gives publicity to a matter concerning another that places the other before the public in a false fight is subject to liability to the other for invasion of his privacy, if (a) the false fight in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false fight in which the other would be placed.’ ” (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 673, p. 988.) A “false light” cause of action is a variety of defamation and is subject to the same requirements. (Aisenson v. American Broadcasting Co. (1990) 220 Cal.App.3d 146, 161 [269 Cal.Rptr. 379].)
“In determining whether a statement is libelous we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication.” (Forsher v. Bugliosi (1980) 26 Cal.3d 792, 803 [163 Cal.Rptr. 628, 608 P.2d 716].) “ ‘ “[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication ... he may be held responsible for the defamatory implication, . . . even though the particular facts are correct.” ’ ” (Weller v. American Broadcasting Companies, Inc. (1991) 232 Cal.App.3d 991, 1003, fn. 10 [283 Cal.Rptr. 644].) A court examines the totality of the circumstances, including the context in which the statement was made. (Baker v. Los Angeles Herald Examiner (1986) 42 Cal.3d 254, 260-261 [228 Cal.Rptr. 206, 721 P.2d 87].) Opinions are constitutionally protected and cannot form the basis of a defamation-type claim. (Id. at p. 260.) Whether a statement constitutes a statement of fact or opinion is a question of law. (Ibid.) “In making such a determination, the court must place *398 itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction.” (Ibid.) Based on the language used and the totality of the surrounding circumstances, the court determines whether the average reader or hearer ‘“could have reasonably understood the alleged defamatory statement to be one of fact.” (Id. at p. 261.) ‘“Photographs are not actionable if they are fair and accurate depictions of the person and scene in question, even if they place the person in a less than flattering light, so long as the photographs do not surpass the limits of decency by being highly offensive to persons of ordinary sensibilities.” (Aisenson v. American Broadcasting Co., supra, 220 Cal.App.3d at p. 161.)
Here, the Internet posting referred only to Daniel’s physical resemblance to the Cleveland Brown cartoon character. It twice expressly referred to how Daniel looked. It did not insinuate or imply that Daniel shared any personality characteristics or, as Daniel argues, “'suggest] | that Daniel is a real-life incarnation of the cartoon figure.” Moreover, it was a combination of an expression of an opinion by Wayans that Daniel looked like Cleveland Brown and an accurate photographic comparison. Accordingly, Daniel did not show a probability of prevailing on his false light claim, and the trial court properly struck it.
D. Quasi-contract
Daniel’s quasi-contract claim (eighth cause of action) is based solely on the Internet posting. According to the complaint, Wayans obtained an improper ‘“benefit” from using Daniel’s likeness in the Internet posting. The Internet posting, according to the complaint, was improper because the photograph of Daniel used in that posting was taken ‘“without [his] consent.”
‘“[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.” (Lance Camper Manufacturing Corp. v. Republic Indemnity Co. (1996) 44 Cal.App.4th 194, 203 [51 Cal.Rptr.2d 622]; see Rutherford Holdings, LLC v. Plaza Del Rey (2014) 223 Cal.App.4th 221, 231 [166 Cal.Rptr.3d 864].)
Here, there was a valid express contract covering the use of Daniel’s photograph in connection with A Haunted House 2: the voucher. By signing the voucher, Daniel not only gave Wayans the right to use his photograph ‘“in any manner whatsoever and for any reason” in connection with the movie, but also acknowledged that the wages he received for his work on the movie were ‘“payment in full”—that is, he is not entitled to any other payment, *399 including payment for the use of his photograph. Because Daniel did not show a probability of prevailing on his quasi-contract claim, the trial court properly struck it.
E. Unjust enrichment
Like his quasi-contract claim, Daniel’s claim for unjust enrichment is based solely on the Internet posting. Technically, “[ujnjust enrichment is not a cause of action, ... or even a remedy”; it is instead a principle or state ‘“describing ‘ “the result of a failure to make restitution.” ’ ” (McBride v. Boughton (2004) 123 Cal.App.4th 379, 387 [20 Cal.Rptr.3d 115].) However, because this appeal concerns an anti-SLAPP motion, we disregard how a plaintiff may have styled or labeled a particular cause of action and focus instead on the claim’s merits. (Hylton v. Frank. E. Rogozienski, Inc. (2009) 111 Cal.App.4th 1264, 1272 [99 Cal.Rptr.3d 805].)
Daniel’s claim for unjust enrichment suffers from two related problems. First, a party to an express contract can assert a claim for restitution based on unjust enrichment by only “ ‘alleging in that cause of action] that the express contract is void or was rescinded.’ ” (Rutherford Holdings, LLC v. Plaza Del Rey, supra, 223 Cal.App.4th at p. 231.) Here, Daniel does not allege in his complaint and has not demonstrated in his declaration opposing Wayans’s motion that the voucher was void or rescinded.
Second, and more substantively, Daniel’s unjust enrichment claim suffers from many of the same problems that bedevil his quasi-contract claim: Daniel (1) was hired as a nonspeaking extra in a one day role; (2) was paid in full for his services; (3) acknowledged in writing that he received “payment in full”; and (4) released any right to any use of his image in connection with the promotion of A Haunted House 2. Consequently, Daniel failed to show a probability of prevailing on his quasi-contract claim, and the trial court properly struck it.
F. Intentional infliction of emotioned distress
Daniel’s claim for the intentional infliction of emotional distress is based on both the on-set comments and conduct and the Internet posting.
The elements of a prima facie case for the tort of intentional infliction of emotional distress are: “ ‘ “ ‘(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff’s suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant’s outrageous conduct. (Potter v. *400 Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965, 1001 [25 Cal.Rptr.2d 550, 863 P.2d 795]; see Hughes v. Pair (2009) 46 Cal.4th 1035, 1050 [95 Cal.Rptr.3d 636, 209 P.3d 963].) “ ‘ “Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.” ’ ” (Potter, at p. 1001.) However, “liability ‘does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,’ but only to conduct so extreme and outrageous ‘as to go beyond all possible bonds of decency . . . ” (Alcorn v. Anbro Engineering, Inc., supra, 2 Cal.3d 493, 499, fn. 5; see Hughes, at p. 1051.)
Here, the allegedly outrageous conduct consisted of a number of boorish and/or juvenile comments about Daniel’s physical appearance, the use of the term nigga, which in contemporary usage may or may not be a term of endearment among African-Americans depending on the circumstances, and an arguably contic juxtaposition of photographs on the Internet. Although Daniel may have found such conduct hurtful, under all the circumstances Wayans’s conduct was not so extreme as to exceed all bounds of that usually tolerated in a civilized community. Rather, the alleged misconduct falls more in the category of insults, indignities, annoyances, and petty oppressions. Accordingly, the trial court properly struck this claim.
V. Attorney fees award
The trial court, pursuant to section 425.16, subdivision (c), awarded Wayans his attorney fees as the prevailing party. Daniel does not challenge the amount of those fees. Instead, his challenge to those fees is a global one—that is, Wayans was not entitled to those fees because his anti-SLAPP motion should not have been granted. Because we hold that the trial court properly granted Wayans’s anti-SLAPP motion, we further hold that the award of attorney fees was proper.
DISPOSITION
The judgment and order granting the anti-SLAPP motion and dismissing the complaint are affirmed. The order granting Marlon Wayans’s attorney fees is also affirmed. Marlon Wayans is awarded his costs on appeal.
Rothschild, P. L, concurred.

 All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

 Lyle, supra. 38 Cal.4th 264 itself is not directly applicable to this case either procedurally (it involved a motion for summary judgment, not a special motion to strike) or substantively (it concerned alleged sexual harassment, not racial harassment, which occurred over the course of foui' months, not during the course of a single day). Nonetheless, the majority opinion, as well as the concurring opinion of Justice Chin, provides a number of illuminating insights about the creative process for developing a somewhat raunchy comedy. Lyle involved a claim by a female employee of a television production company that the use of sexual language in the workplace by the male writers of the television show Friends gave rise to a hostile work environment. (Id. at p. 271.) The Supreme Com! “granted review to address whether the use of sexually coarse and vulgar language in the workplace can constitute harassment based on sex within the meaning of the [California Fair' Employment and Housing Act (FEHA) (Gov. Code, § 12900)] (Id. at p. 272.) It concluded: “Based on the totality of the undisputed circumstances, particularly the fact that the Friends production was a creative workplace focused on generating scripts for an adult-oriented comedy show featuring sexual themes, we find no reasonable trier of fact could conclude such language constituted harassment directed at plaintiff because of her sex within the meaning of the FEHA.” (Ibid.) The Lyle majority went on to state: “That the writers commonly engaged in discussions of personal sexual experiences and preferences and used physical gesturing while brainstorming and generating script ideas for this particular show was neither surprising nor unreasonable from a creative standpoint.” (Id. at p. 287.)
Based on the testimony of Wayans, Pressly and Alvarez about the improvisational creative process used for the making of A Haunted House 2—an adult-oriented, R-rated feature-length comedy featuring race-based humor—it is not surprising or unreasonable that terms such as nigga, nigger and niggie, which were used dozens of times in the final version of the movie, were also used by the cast and writers as they brainstormed ideas for the script while on-set but in between the filming of scenes (i.e„ “during breaks, while no cameras were rolling”).
In short, the creative process should not be confined, as Daniel argues, to a fixed place or point in time (i.e„ only when the cameras are rolling). To borrow from Ernest Hemingway, the creative process, depending on the circumstances, may well be a movable feast.

 “A Jheri curl is created by a chemical process that gives black people’s hair a glossy, loosely curled look. . . . The most famous person to wear a Jheri curl likely was the late Michael Jackson during the mid-1980s.” (Onwuachi-Willig, Another Hair Piece: Exploring New Strands of Analysis Under Title VII (2010) 98 Geo. L.J. 1079, 1129, fn. 252; see People v. Fudge (1994) 7 Cal.4th 1075, 1089, 1092 [31 Cal.Rptr.2d 321, 875 P.2d 36] [witness identification based on man’s “ ‘jheri-curls’ ”]; People v. Harrison (2005) 35 Cal.4th 208, 231 [25 Cal.Rptr.3d 224, 106 P.3d 895] [same].)

 Although A Haunted House 2 was a major theatrical production, we do not intend to suggest that smaller productions would not qualify for protection as being in the public interest.

 It should be noted that although Daniel may not have been widely known prior to his appearance in A Haunted House 2, he actively sought to increase his standing before the public when he agreed to act in the movie. By agreeing to appear in the movie, Daniel “voluntarily subjected [him] self to inevitable scrutiny and potential ridicule by the public and the media.” (Seelig v. Infinity Broadcasting Corp. (2002) 97 Cal.App.4th 798, 808 [119 Cal.Rptr.2d 108].)

 Both Wayans’s special motion to strike and Daniel’s opposition thereto addressed the fourth cause of action, which alleges a violation of the Unruh Civil Rights Act. On appeal, however, Daniel provides no argument with respect to that cause of action. We necessarily conclude that he has either conceded the propriety of granting the anti-SLAPP motion as to that cause of action or has forfeited any contention regarding it.

 See Parks and Jones, “Nigger”: A Critical Race Realist Analysis of the N-Word within Hate Crimes Law (2008) 98 J. Grim. L. & Criminology 1305, 1306 (“the N-word has a different connotation when used intra-racially among Blacks than when directed at Blacks by Whites”). It should be noted, however, that others see little difference between nigger and nigga: “whether it ends in -a or -er, the first thing that comes to mind is a negative image of a black person.” (Frost, What is the Difference Between “Nigga” and “Nigger?” (Feb. 27, 2014) The Pioneer <http://thepioneeronline.com/20399/opinions/what-is-the-difference-between-nigga- and-nigger> [as of Feb. 9, 2017].)
The key fact for our purposes here is that in contemporary usage nigga is not an unambiguous racial epithet, but a term which can have a number of different meanings when used by different people in different contexts. The highly ambiguous/context-specific nature of the term nigga is captured by Dictionary.com: “Nigga is used mainly among African Americans, but also among other minorities and ethnicities, in a neutral or familial' way and as a friendly term of address. It is also common in rap music. However, nigga is taken to be extremely offensive when used by outsiders. Many people consider this word to be equally as offensive as nigger.” (<http://www.dictionary.com/browse/nigga?s=t> [as of Feb. 9, 2017]).
To borrow from and paraphrase Professor Kennedy, “[m]ore vividly than most words, then, [nigga] illustrates Justice Oliver Wendell Holmes’s observation, that ‘a word is not a crystal, transparent and unchanged, ... [it is] the skin of a living thought [and] may vary greatly in color and content according to the circumstances and the time in which it is used.’ ” (Kennedy, Nigger: The Strange Career of a Troublesome Word, supra, at p. 55.)

 In the original Haunted House, the word nigga was used “numerous times” and in another prior movie in which Wayans starred, authored, and produced, the word nigger was used 55 times in the final, released version of the film.

 One of the cases upon which Daniel relies, Rodgers, supra. 12 F.3d 668, illustrates how big of a gap there is between Daniel’s allegations of a hostile work environment and what courts have actually found to be a hostile work environment. In Rodgers, the plaintiffs supervisor, a White man, who also liked the plaintiff, a Black man, used profanity and personal insults to motivate the plaintiff and other subordinates. The insults included unambiguous racial remarks—including the use of the word nigger—as well as many race-neutral epithets over the course of 12 years. (Id. at p. 671.) In addition to verbal abuse, the plaintiffs supervisor on one occasion dumped out the contents of the plaintiffs desk. (Ibid.) As a result of the “harsh treatment and racist language,” plaintiff suffered a number of physical problems for which he sought medical treatment. (Ibid.) Despite the job-related stress resulting from the harsh treatment and racial insults, the plaintiff continued to work for the defendant. (Ibid.) However, the stress became so severe that the plaintiff repeatedly asked for a demotion and when the last of those requests were refused, he resigned. (Id. at p. 672.) Here, in contrast to the plaintiff in Rodgers. Daniel was exposed to a handful of arguably racist comments and some arguably offensive but race-neutral comments over the course of a single work day, comments which apparently did not interfere with his work performance at all or force him to *393 seek reduced responsibilities or any other on-the-job relief from the alleged misconduct. Nor does the record reflect that the alleged harassment has caused Daniel to seek any subsequent medical treatment.