Filed 12/21/21  Bleckman v. Katzenbach CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| GAIL BLECKMAN, | B308819 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STLC01640) |
| v. | |
| RYAN KATZENBACH, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Laura A. Seigle, Judge.  Affirmed.

The Kernan Law Firm, S. Michael Kernan and R. Paul Katrinak for Plaintiff and Appellant.

Ryan Katzenbach, in pro. per., for Defendant and Respondent.

———————————————

Gail Bleckman (appellant) appeals from the denial of her Code of Civil Procedure section 425.16[1] motion to dismiss the cross-complaint filed by Ryan Katzenbach (respondent). He alleged that appellant made false statements that clouded title to a film he was trying to relicense to a cable network for further broadcast. We find no error and affirm because appellant failed to establish that her statements were either made in anticipation of litigation or were an exercise of free speech in connection with a matter of public interest.

## FACTS

**The Complaint**

In a complaint filed February 13, 2019, appellant sued respondent for an accounting.

As alleged: Appellant was introduced to respondent in 2010 while he was in the early stages of developing a film about the 1974 murders committed by Ronald DeFeo, Jr., (DeFeo) in Amityville, New York (Amityville Project). The project led to the development of three films, a special aired on television by REELZChannel (REELZ), and a DVD interview with DeFeo. Based on information and belief, (1) appellant and respondent are co-owners of the Amityville Project, and (2) they "orally agreed that [appellant] was to receive 5 [percent] of any gross receipts from the Amityville Project, and as consideration [appellant] would conduct research and perform other work for the

---

[1]     All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Section 425.16 is known and referred to as the anti-SLAPP statute. (*Guessous v. Chrome Hearts, LLC* (2009) 179 Cal.App.4th 1177, 1180.) "SLAPP is an acronym for strategic lawsuit against public participation." (*Id.* at p. 1180, fn. 1.)

2

Amityville Project as an independent producer and at her own expense[.]"

On April 20, 2018, appellant obtained a judgment ordering respondent to pay her $4,806.80 related to the Amityville Project. Respondent paid the judgment. Since that time, respondent has continued to license or sell "the film in question," and he has failed to account for the monies received. Without an accounting, appellant does not know whether respondent owes her any money.

**The Cross-Complaint**

Respondent filed a cross-complaint that alleged causes of action against appellant for intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, defamation, and violation of Business and Professions Code section 17200. He alleged the following facts.

In 2010, respondent was working on an independent film about the Amityville murders (Film). Appellant represented that she could secure distribution for the Film and work as a researcher. They entered a verbal agreement that would entitle appellant to a 5 percent royalty of the Film's adjusted gross income. The parties understood that the verbal agreement was to be reduced to a written contract. When appellant was presented with the written contract in October 2012, she did not sign it. Rather, she proceeded to disappear for two years. She resurfaced in October 2014 after learning that respondent had licensed the Film to REELZ. Though she never performed her duties, she demanded to be paid. Respondent promised to pay her if she signed the contract. She disappeared again. Then, in 2016, she sued respondent and sought contract damages as well

3

as punitive damages.  That action was classified as a limited jurisdiction case, and then she dismissed it in favor of seeking $10,000 in small claims court.  In April 2018, she obtained a judgment for about $4,800.

After the license expired, respondent entered negotiations with REELZ for a renewal in a deal worth $50,000. Subsequently, in July or August 2018, respondent "received a phone call from REELZ advising him that the deal was off the table because [appellant] had personally contacted the network and advised them that [respondent] 'did not have the right to sell the film because he did not have clear rights or he did not own the rights.'"  Appellant may have communicated with REELZ executives through e-mails and other written correspondence.

**Notice and Acknowledgment of Receipt**

Appellant's counsel completed a Notice and Acknowledgement of Receipt stating, "This acknowledges receipt of . . .  [¶]  . . .  [¶]  Cross-complaint of [respondent], which was never served."

**The Anti-SLAPP Motion**

Appellant filed an anti-SLAPP motion and respondent opposed the motion.

In his declaration, respondent stated that when appellant was awarded about $4,800 in small claims court, he paid the judgment and informed REELZ.  They proceeded to speak about renewing the license to the Film.  In mid-2018, Steve Cheskin (Cheskin) from REELZ called respondent to tell him that appellant had contacted the network and said something "to the effect[] that '[REELZ] needed to compensate her because [respondent] did not have the right to license the film from the start[,]' and that if [REELZ] didn't pay up, she was going to sue

4

them next.' She made it very clear . . . that the chain of title had issues." Cheskin informed respondent that the license renewal deal was dead.

**The Ruling**

In its minute order on the matter, the trial court noted the following facts: Respondent never served the cross-complaint. Appellant's counsel, nonetheless, e-mailed respondent and stated, "You filed a cross-complaint but never served it. We downloaded it from the court website today. We will deem it served today and have a response within 30 days." Appellant filed a Notice and Acknowledgement of Receipt of the cross-complaint. Two days later, respondent e-mailed appellant's counsel, averring, "This counterclaim was withdrawn in early August—I have no idea, in checking the Court docket, why this hasn't been reflected. This is why the cross-complaint was never served. I will dismiss it via a fax filing yet again. . . . Two hours later, at 4:10 p.m., [appellant] filed her anti-SLAPP motion. . . . [Appellant] does not contest these facts."[2]

The trial court stated, "The anti-SLAPP motion . . . [is] unnecessary and a waste of time and resources. [Respondent] never served the cross-complaint and had decided not to serve it, so there was no reason for [appellant] to proactively accept service. [Respondent] told [appellant's] counsel he had tried to

_____

[2]     The trial court did not mention the parties' subsequent communications. On January 24, 2020, appellant's counsel e-mailed respondent, stating, "Just dismiss your cross-complaint as you said you would do. Send me the dismissal." Respondent e-mailed back, "You either dismiss your case with prejudice or I will seek my legal remedies. [¶] You dismiss and I will dismiss my [cross-complaint]."

dismiss the cross-complaint and would submit the dismissal again, [and] there was no reason for [appellant] to immediately file the anti-SLAPP motion without first giving [respondent] the time to dismiss the cross-complaint." According to the trial court, appellant did not display the cooperation that is expected of parties during litigation. Under the circumstances, "the filing of the anti-SLAPP motion was unnecessary and appears to have been filed only to gain an advantage and seek attorney fees." The trial court ruled: "Accordingly, subject to [respondent] dismissing the cross-complaint, the anti-SLAPP motion is [denied][.] . . . If [respondent] does not dismiss the cross-complaint within 20 days of the date of this order, the [trial court] will put the anti-SLAPP motion . . . back on calendar for a hearing on the merits."

This appeal followed.

## DISCUSSION

### I. Anti-SLAPP Law.

Section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

The speech and conduct protected by the anti-SLAPP statute are: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial

6

body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Statements made in anticipation of litigation are protected under section 425.15, subdivision (e), clause (2). (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) They must concern "'the subject of the dispute'" and the future litigation must be "'"contemplated in good faith and under serious consideration"'" [citation][.]"[3] (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268 (*Chudacoff*).) The statute applies even if the statements are made to "persons who are not parties or potential parties to litigation[.]" (*Id.* at p. 1270.)

Courts employ a two-prong analysis when analyzing an anti-SLAPP motion. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) First, the moving party must make an initial showing that the anti-SLAPP statute applies to the claims that are the subject of the motion. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 819.) If the moving party does so, the motion will be granted unless the court determines that the plaintiff has established a probability of prevailing on the claim. (*DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 567–568.)

---

[3] Good faith refers to a good faith intention to file a lawsuit rather than a good faith belief in the truth of the communication. (*Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 887.)

## II. Standard of Review.

We independently review the denial of an anti-SLAPP motion. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.) If the record supports the trial court's order, it will be upheld regardless of the grounds relied upon by the trial court. (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457.)

## III. First Prong Analysis.

Appellant argues that the statements she allegedly made are protected because they: (1) were made in anticipation of litigation and fell within section 425.16, subdivision (e), clause (2); and (2) stemmed from the exercise of free speech in connection with a public issue or a matter of public interest and are protected by section 425.16, subdivision (e), clause (4).

The law is not on her side.

A. Whether the Statements were Made in Anticipation of Litigation.

In her opening brief, appellant asserts that *Feldman v. 1110 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1481 (*Feldman*) supports the conclusion that the statements she made to REELZ disparaging respondent's title to the Film were made in anticipation of litigation.

In *Feldman*, an agent of an apartment building told subtenants of a unit that their sublease had not been approved and they had to either pay higher rent or move out. According to one of the subtenants, the agent made these threatening comments: "'(A) That he has done hundreds of evictions, so he knows the landlord will win, and how many had we done? [¶] (B) That regardless of the outcome of the current case, my wife and I will never be able to rent another apartment in

8

San Francisco;  [¶]  (C) That he understands the law and has discussed the case with his uncle, who is a federal judge;  [¶]  (D) That we will not be able to file suit against them because they will win; [and]  [¶]  (E) That we could not have read the Addendum properly.'" (*Feldman, supra*, 160 Cal.App.4th at pp. 1474–1475.)  The apartment building filed an unlawful detainer action against the subtenants who, in turn, filed a cross-complaint alleging causes of action for contract and tort damages arising out of the dispute.  The trial court granted the apartment building's anti-SLAPP motion as to one cause of action, retaliatory eviction. (*Id.* at pp. 1475–1477.)

The *Feldman* court held that the agent's "threats" were "within the scope of the anti-SLAPP statute" because they were "communications in connection with an ongoing dispute and in anticipation of litigation. [Citation.]" (*Feldman, supra*, 160 Cal.App.4th at pp. 1474–1475.)

There is no analogy between this case and *Feldman.*  The threats in *Feldman* concerned the subject of the dispute over the subtenants' occupancy of a unit in the apartment building.  Given that the apartment building filed an unlawful detainer action, it is apparent that the threats were made in anticipation of litigation contemplated in good faith and under serious consideration. (*Chudacoff, supra*, 160 Cal.App.4th at p. 1268.)  Here, in contrast, the statements disparaging respondent's title to the Film did not concern the contract dispute between appellant and respondent over whether she was entitled to a percentage of the proceeds earned by the Film.  Also, appellant did not sue respondent over ownership of the Film or otherwise challenge his right to either license or sell the Film, so there is no basis to infer that she was seriously and in good faith

9

contemplating such litigation. The one sentence in the complaint alleging that appellant believes that she and respondent are co-owners of the Amityville Project does not shore up the deficiency. The complaint offers no factual basis for her belief, and, in any event, it is superfluous. Even assuming the allegation is somehow relevant to appellant's claim for an accounting, it does not implicate litigation over whether respondent lacked title or the right to sell or license the Film.

Alternatively, appellant cites *Graham-Sult v. Clainos* (9th Cir. 2014) 756 F.3d 724 (*Graham-Sult*) and argues that her statements categorially qualify as protected activity under the anti-SLAPP statute because they were made to REELZ, an entity that had at least "some interest" in past and future litigation between appellant and respondent. *Graham-Sult* is not the panacea appellant hopes.

The case arose out of the probate of the estate of a successful rock and roll concert promoter who was survived by two sons. The executor of the estate (who doubled as trustee of the sons' testamentary trusts) and his attorneys made statements that deceived the sons and probate court into thinking the decedent had assigned away his intellectual property (copyrights and a trademark), and the executor promised to distribute scrapbooks to the sons but never fulfilled that promise. Further, the attorneys prepared, and the executor signed, an assignment confirming that the intellectual property was owned by a corporation the decedent had founded. Following the probate court's final order of distribution, the sons sued the executor and his attorneys for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of trust, fraud, promissory estoppel, conversion, aiding and abetting conversion,

10

and unjust enrichment, claiming they had been cheated out of a pro rata distribution of the intellectual property, the scrapbooks, and a series of original posters. The defendants filed an anti-SLAPP motion, which was granted. (*Graham-Sult*, *supra*, 756 F.3d at pp. 731–740.)

In its first prong analysis, the Ninth Circuit concluded that the conversion and unjust enrichment causes of action did not implicate protected activities of the executor. It reached the opposite conclusion as to breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of trust, aiding and abetting conversion, fraud and promissory estoppel. (*Graham-Sult*, *supra*, 756 F.3d at pp. 735–740.)

With respect to breach of fiduciary duty and aiding and abetting breach of fiduciary duty, the court explained that the defendants' activity was protected "to the extent it involve[d] making representations to the probate court, or preparing documents for filing in court. [Citation.]" (*Graham-Sult*, *supra*, 756 F.3d at p. 736.) Also, it was protected "to the extent it involve[d] statements made to the [sons], who had 'some interest' in the probate proceedings. [Citation.]" (*Ibid*.) To support this latter point, the court cited *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1167 (*Fremont*), a case explaining that a "'statement is 'in connection with' an issue under consideration by a court in a judicial proceeding [within the meaning of clause (2) of section 425.16, subdivision (e)] if it relates to a substantive issue in the proceeding and is directed to a person having some interest in the proceeding.'" (*Graham-Sult*, *supra*, 756 F.3d at p. 736.) By citing *Fremont*, *Graham-Sult* impliedly concluded that the deceptive statements that the

11

defendants made to the sons related to substantive breach of fiduciary duty issues.[4]

Regarding breach of trust, the sons alleged that the executor "'breached . . . duties in his 'characterization, valuation and distribution of assets,' and that the trusts received reduced distribution[.]" (*Graham-Sult*, *supra*, 756 F.3d at p. 737.) The court concluded that "these activities were all preparatory to probate court filings, or required the probate court's approval. Accordingly, [the son's] [c]ause of [a]ction arises from protected activity. [Citation.]" (*Ibid.*)

The sons alleged that the attorneys aided and abetted the executor's conversion of property by "(1) falsifying probate court filings, (2) concealing information from [the sons] and the probate court, (3) making false statements to [the sons] and the probate court, and (4) assisting with the preparation of the [a]ssignment." (*Graham-Sult*, *supra*, 756 F.3d at p. 739.) This was a mixed cause of action but the anti-SLAPP benefits applied because the representations made to the sons and the court filings "could have constituted independent acts of aiding and abetting . . . conversion." (*Ibid.*)

Turning to fraud, the court concluded that misleading statements and omissions "made to persons with an interest in a

---

[4]     The breach of fiduciary duty and aiding and abetting breach of fiduciary duty were mixed causes of action because they contained allegations of both protected activity (misleading statements and court filings) and unprotected activity (self-dealing and preparation and execution of the assignment). Anti-SLAPP benefits applied to the protected activity because it was not merely incidental to the unprotected activity. (*Graham-Sult*, *supra*, 756 F.3d at pp. 735–736.)

12

court proceeding are categorically protected activity under the anti-SLAPP statute. [Citation.]" (*Graham-Sult*, *supra*, 756 F.3d at p. 739.)  Once again, the court cited *Fremont* in support of its conclusion.  Thus, the court implied that the statements and omissions related to substantive issues in the case.  (*Ibid*.)

The promissory estoppel cause of action alleged that the executor promised to give the scrapbooks to the sons as part of the distribution of the assets of the estate.  The court concluded: "Because [the executor] made this [promise] to parties with an interest in the litigation about the subject matter of the probate proceedings (the distribution of assets), we conclude under *Fremont* that [the promissory estoppel] cause of action arises from protected activity. [Citation.]" (*Graham-Sult*, *supra*, 756 F.3d at p. 740.)

In the second prong analysis, the question was whether the sons had a reasonable probability of prevailing "in the face of three substantive defenses:  (i) the litigation privilege, (ii) the statute of limitations, and (iii) res judicata." (*Graham-Sult*, *supra*, 756 F.3d at p. 741.)  The Ninth Circuit concluded that all but one cause of action arising from protected activity were barred by defenses and properly dismissed.  The exception was breach of fiduciary duty.  The district court erred when it ruled that all the cause of action's allegations implicated the litigation privilege.  While some did (those related to statements made to the probate court or the sons), others (such as allegations of self-dealing) did not.  (*Id*. at pp. 746–748, 753.)  The case was remanded for the district court "to determine whether [the sons] can make an adequate showing to survive a motion to strike on the remainder of the claim." (*Id*. at pp. 746–747.)

13

The takeaway from *Graham-Sult* and *Fremont* for purposes of this appeal is that a statement made to a party with an interest in litigation is entitled to the benefits of the anti-SLAPP statute only if it passes the relatedness test. Appellant's reliance on *Graham-Sult* fails because her statements were not related to a substantive issue in her accounting claim.

In her reply brief, appellant argues that her statements qualified as protected activity because they "were made shortly before she initiated this lawsuit for an accounting;" REELZ was the main damages witness in the prior case and the current case; and "any statement to the effect that [respondent] did not acquire any rights to her copyrighted work would be completely protected as true . . . because one cannot acquire copyrighted works through an oral agreement."[5]

We cannot agree. Once again, her statements were unrelated to a substantive issue in her complaint for an accounting.

B. <u>Whether the Statements were an Exercise of Free Speech Involving an Issue of Public Interest</u>.

Taking a new tack, appellant posits that her statements to REELZ were an exercise of her right of free speech in connection with the creation, casting and broadcasting of the Film, and that the Film was a matter of public interest. (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 ["The creation of a television show is an exercise of free speech," and acts designed to assist in the creation, casting and broadcasting of the television show were in furtherance of its creation]; *Daniel v.*

---

[5] Appellant does not identify her "copyrighted works." She implies that she alone owns the copyright to the Film but does not explain how that is possible.

14

*Wayans* (2017) 8 Cal.App.5th 367, 383–384 [statements on a film set and in Internet promotions were made in furtherance of the creation of the film, an act of free speech]; *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807–808 [radio commentary about a participant on a television show called *Who Wants to Marry a Multimillionaire* was protected activity because it involved a matter of public interest].)

This argument fails to land. There is no basis to conclude that appellant was assisting the Film's creation or casting by disparaging respondent's title many years after the Film was made and first broadcast. Furthermore, it is impossible for us to discern how appellant's statements disparaging respondent's title helped get the Film broadcast on REELZ when, in fact, the statements sabotaged the deal for renewal of the license. Because the statements were not connected to creating and distributing the Film, we reject appellant's argument that they involved a matter of public interest.

**IV. Other Issues.**

The parties debate whether the trial court properly denied appellant's motion because it was unnecessary and a waste of resources, and whether respondent established a likelihood of success on the merits. These issues are moot because the cross-complaint does not arise from activity that is protected by the anti-SLAPP statute.

## DISPOSITION

The order is affirmed.  Respondent shall recover his costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ


16