Filed 9/2/25  P. v. Ramsey CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B334712 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA082023) |
| v. | |
| RASHAUD RAMSEY, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Rashaud Ramsey appeals the judgment of conviction for murder. He contends the trial court erroneously admitted involuntary statements he made to police and erroneously admitted an accomplice's statements to an undercover law enforcement officer. We affirm the judgment.

## BACKGROUND

### A. The Murder

On the evening of February 13, 2021, Ramsey, Willie Wilkerson, Jr. (Wilkerson), and his cousin Hassan Wilkerson (Hassan), all wearing masks, broke into a residence in Lancaster and shot three of the four occupants, killing Elijah Martin and seriously wounding his brother, Dashawn Davis.

Los Angeles County Sheriff's Department criminalists found bullet holes throughout the house and recovered expended bullets consistent with having been discharged from a .40 caliber Smith & Wesson handgun and a nine-millimeter Luger. A bullet recovered from Martin's body had rifling characteristics similar to two nine-millimeter bullets recovered from the scene. None of the residents of the house had fired a gun. No firearms were recovered from the residence.

DNA analysis of blood on the wall of a bedroom and exterior block wall identified Ramsey, who Wilkerson accidentally shot, as the donor.

### B. Ramsey Interrogations

In September 2021, police arrested 19 year old Ramsey. As a result of his being shot by Wilkerson he used a colostomy bag. Detective Kasey Woodruff and his partner interrogated him twice on the day he was arrested. Recordings of the interrogations were played for the jury.

### 1.     *First Interrogation*

Detective Woodruff advised Ramsey of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and informed him they were interviewing him about a shooting in Lancaster on February 13, 2021.  Throughout the interrogation, detectives repeatedly admonished Ramsey to tell the truth, which they said was the only thing that could help him.

Ramsey's version of events went through several iterations increasingly revealing his involvement in the shooting.  He first denied ever "hang[ing] out" in Lancaster or knowing Martin or Davis and said he had been shot in Victorville on February 13, 2021.  Detective Woodruff replied that he had "tons of evidence" showing Ramsey was in Lancaster on February 13, including Ramsey's blood and DNA "all over" the crime scene and video of his car driving to Lancaster around 5:30 p.m. that day and leaving at around 11:24 p.m.  Detective Woodruff said, "This is your one chance to be honest."  Ramsey then admitted he was in Lancaster on February 13 with Wilkerson.

Ramsey told Detective Woodruff, "I tell you all the bullshit out the way.  This is real real.  This is man to man."  He said that Wilkerson got in "so much dumb shit" that Ramsey had to take the part of a big brother.  On February 13, Wilkerson told Ramsey he "had to go do somethin[g]."  They drove to the Lancaster house and Wilkerson went inside while Ramsey waited outside.  Ramsey heard shots fired and was himself shot.  Detective Woodruff asked, "How'd you get inside the house?"  Ramsey replied, "I was—at that point it's just like I hopped like the wall because the gate was open and I heard . . . gunshots and shit."  "So after that . . . situation's over, I come out."

In the next iteration of the story, Ramsey said he and Wilkerson drove from Victorville to the victims' house to buy marijuana.  Ramsey parked in front of the house and Wilkerson

entered the front door. Ramsey heard gunshots and jumped over a wall to the side of the house. He peeked through a glass sliding door, heard more gunshots, and was shot.

When Detective Woodruff asked how his blood got on a wall inside a bedroom, Ramsey at first denied being in the bedroom but then asked, "[C]an I tell . . . my story?" Detective Woodruff replied, "Yeah," and Ramsey said, "[S]hots go off. I hopped the brick wall. . . . [A]fter . . . shots went . . . off I went inside" through an open back door. When Detective Woodruff asked how he got into the bedroom, Ramsey again asked if he could tell his story. Woodruff again responded, "Go ahead," and Ramsey said he was shot inside the house by, he thought, "the dude that was dressed," referring to Martin. He then fled through the bedroom window. Ramsey said neither he nor Wilkerson had a gun at the house.

Detective Woodruff said that Ramsey's story about being shot in Victorville was "bullshit," and he had one chance to be honest because the detectives would probably not talk to him again. Ramsey asked, "Can I tell you somethin' please?" Detective Woodruff said, "Yeah, go ahead."

In the next version, Ramsey denied having a gun but admitted that Wilkerson had one. Detective Woodruff told Ramsey they would next interview Wilkerson, who would blame Ramsey for the crimes. Ramsey continued to deny having or firing a gun. Detective Woodruff told Ramsey that his story did not make sense and that he knew Ramsey was lying when he said he did not have or fire a gun.

Ramsey asked, "[C]an I say this please?" to which Detective Woodruff responded, "Go ahead." Ramsey said he was "telling [Detective Woodruff] as a man" that Wilkerson shot Martin.

### 2. *Second Interrogation*

At the start of the second interrogation, Detective Woodruff readvised Ramsey of his *Miranda* rights, which Ramsey stated

he understood. Detective Woodruff again told Ramsey to be "completely honest," and said his story did not match the evidence. Ramsey repeatedly denied firing a gun.

Detective Woodruff said that contrary to Ramsey's version, Wilkerson's account matched the evidence from the crime scene. Wilkerson told detectives that he, Hassan and Ramsey went to the house to steal things, entering through a bedroom window. Once inside, Ramsey was to keep watch. Wilkerson had the nine-millimeter gun and Ramsey the .40 caliber.

Ramsey admitted they entered the house through the bedroom window to steal marijuana, and said that Hassan then asked, "[Y]ou wanna take some shoes?" to which Ramsey replied, "[Y]eah, well, I'll take some."

Detective Woodruff again explained that Wilkerson's story, unlike Ramsey's, matched the evidence, and said that Ramsey should be truthful so the detectives could tell the prosecutor that he was at least honest.

Detective Woodruff asked Ramsey how many times he fired a gun in the house. Ramsey responded, "Once. [¶] . . . [¶] . . . I shot the brown gun." Ramsey said he fired in Martin's direction, hitting a wall, then gave the gun to Hassan.

During the interrogation, Ramsey repeatedly asked to give his version of events, inquired about the evidence against him, and stated he wanted to protect Wilkerson. He denied possessing or firing a gun at least 15 times before admitting that he fired one shot.

### C.     Hassan Wilkerson's Jailhouse Statements

Police arrested Hassan on November 10, 2022, more than a year after the Ramsey interrogation and almost two years after the shooting. Detectives placed him in a cell with an undercover law enforcement officer and audio-recorded their conversation. The recording was played at trial.

The officer asked Hassan, "Wassup with you?  Why you got your head down [B]lack man?"  Hassan responded that he was "messed up" and did not know what to do.  The officer told Hassan, "Got to keep your head up.  Wassup N***a?  I've been through some shit.  But what the fuck they talking to you about?"

Hassan told the officer that his cousin and his cousin's friend killed a "boy, and shot his brother and his sister."  He admitted he was at the scene of the murder but denied participating in it.

The officer said, "So, so you said your peoples was up in the house?  So what happened with their shit n***a?"  Hassan responded that "[b]asically, what was supposed to go down was a robbery, and a robbery didn't take place."  Hassan explained that his cousin and the friend had asked him to participate in a robbery, and Hassan agreed.  While in the car Hassan's cousin and the friend talked "some nonsense" about killing someone.  Hassan told them it was not worth it, and they did not need to kill anybody.  They appeared to agree, but once they got to the crime scene, Hassan's cousin and the friend "bust[ed] in shootin[g]."

The officer asked what Hassan did with the guns.  Hassan responded that his cousin and the friend got rid of them.  He admitted he had touched one of the guns, and when shots were fired he ran out of the house.  Hassan's cousin accidentally shot his friend as they ran away.

The officer asked if "these n***as is like, like, y'all just talking and they said man, let's go hit these n***as [the victims], or what?"  Hassan responded they were just talking about what they could do to get money, and believed the victims had jewelry or some money.  The officer asked how they got into the house.  Hassan responded that they arrived in his cousin's friend's car, entered through an open window on the side of the house into a dark, unoccupied room.  His fingerprints might be in the car but would not be in the house because he wore gloves and a mask, which he later discarded.

### D.    Trial

The People charged Ramsey with murder, residential burglary, attempted residential robbery, and two counts of assault with a semiautomatic firearm, and alleged he used a firearm to commit the crimes.

#### 1.    *Admission of Ramsey's Interrogation*

Ramsey's counsel filed a pretrial motion to exclude Ramsey's interrogation, particularly his admission that he discharged a gun at the crime scene.  Counsel argued that the admission was involuntary because Ramsey was subjected to prolonged and repeated badgering by the detectives.  Counsel asserted Ramsey was 19 years old at the time of the crimes, was intellectually impaired, continued to suffer from the gunshot wound he received during the charged crimes, and during the interrogation had repeatedly denied firing a weapon.  Counsel argued that the interviewing detectives repeatedly suggested that Ramsey's codefendant might implicate him, that the interview was Ramsey's last chance to be honest, and that it would look better to the prosecutor if Ramsey made a truthful statement.  The detective repeatedly accused Ramsey in an elevated voice of being a shooter, and repeatedly stated Ramsey's denials did not make sense.  Ramsey's counsel argued that these constituted prolonged, manipulative tactics.

The court disagreed.  After listening to the interrogation and reviewing the transcript, the court found that police used no tactics it would characterize as manipulative.  Although Ramsey was 19 years old, he was "clearly in control of the interview from start to finish."  The court found Ramsey had read, understood, and waived his *Miranda* rights.  Further, nothing indicated that the injury he sustained seven months prior to the interview influenced his responses.  And, although the interview was

prolonged, Ramsey's statements were voluntary. The court denied his motion to exclude them.

## 2. *Admission of Hassan's Statements*

In a trial brief, the prosecutor argued that Hassan's jailhouse statements should be admitted under Evidence Code section 1230, the hearsay exception for statements against penal interest. The prosecutor provided a recording and transcript of the statements.

Defense counsel objected to Hassan's jailhouse statements on the ground that Hassan could not be cross-examined because he had asserted his Fifth Amendment right against self-incrimination. Counsel further objected that although some of the statements were incriminating (in that Hassan admitted being at the crime scene), the statements implicating Ramsey were not against Hassan's penal interest because by implicating Ramsey, Hassan minimized his own conduct.

The court found Hassan's statements were admissible as statements against penal interest, and that they were trustworthy, and admitted them.

## 3. *Trial*

At trial, the prosecution played recordings of Ramsey's interrogation and Hassan's jailhouse statements.

The jury convicted Ramsey as charged, and the court sentenced him to 29 years to life plus 13 years 4 months.

## DISCUSSION

## A. Admission of Ramsey's Interrogation

Ramsey contends the trial court erred in admitting his admission about firing a gun because the detectives' manipulative tactics rendered the admission involuntary. We disagree.

The federal and state Constitutions bar the use of involuntary statements. (*People v. Dykes* (2009) 46 Cal.4th 731, 752 (*Dykes*).)

8

A confession or statement is involuntary if it is not the " ' "product of a rational intellect and a free will" ' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398) or if it is the result of the suspect's will being overborne (*People v. Cruz* (2008) 44 Cal.4th 636, 669).

We consider the totality of the circumstances in determining whether a confession is voluntary, examining the nature of the interrogation and the characteristics of the defendant. (*Dickerson v. United States* (2000) 530 U.S. 428, 433–434; *Dykes*, *supra*, 46 Cal.4th at p. 752.) Factors to consider include: (1) police coercion, if any; (2) the length and location of the interrogation; (3) the defendant's maturity, education, physical condition, and mental health; and (4) whether the suspect was advised of his *Miranda* rights. (*Withrow v. Williams* (1993) 507 U.S. 680, 693–694.) The "crucial element" in assessing whether a confession or statement is voluntary is whether police used coercive tactics. (*Ibid.*; *Colorado v. Connelly* (1986) 479 U.S. 157, 167 [police coercion is a "necessary predicate"]; *People v. Maury* (2003) 30 Cal.4th 342, 405.) The state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence. (*People v. Weaver* (2001) 26 Cal.4th 876, 920.)

We independently review the voluntariness of a confession, upholding the trial court's findings as to the circumstances surrounding the confession if supported by substantial evidence. (*People v. Holloway* (2004) 33 Cal.4th 96, 114.)

Here, Ramsey was advised of and said he understood his *Miranda* rights. He repeatedly asked detectives during the interrogation if he could speak, agreed to keep talking with them, and minimized his culpability. That a suspect "chooses to speak after being informed of his rights is, of course, highly probative" in deciding whether a confession was voluntary. (*Oregon v. Elstad* (1985) 470 U.S. 298, 318; *People v. Williams* (2010) 49 Cal.4th 405, 442; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1011.)

Nor was the interrogation unduly prolonged by the detectives. Ramsey repeatedly asked to give his version of events, inquired about the evidence against him, and stated he wanted to protect Wilkerson. He admitted his involvement in a piecemeal fashion and never asked detectives to stop the interview.

Ramsey argues that over 15 times he denied firing a gun during the incident but was eventually worn down by manipulative tactics which produced an unreliable statement. Ramsey identifies no specific coercive tactic, and we discern none. Prohibited coercive police tactics include " ' "only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' " (*People v. Wilson* (2024) 16 Cal.5th 874, 918.) Asking repetitive questions and repeatedly accusing the suspect of lying do not by themselves tend to produce involuntary and unreliable statements. (See *id.* at p. 919 ["officers may 'exhort a suspect to tell the truth and repeatedly express that they believe a suspect is lying' "]; *People v. Spencer* (2018) 5 Cal.5th 642, 674 [complained-of tactics including repeated expressions that the defendant was lying do not constitute coercion], & 673 [that the defendant had the wherewithal to repeatedly articulate a version of events minimizing his involvement was a factor showing his statements were not involuntary].)

We conclude substantial evidence supports the trial court's finding that Ramsey's statements to detectives were voluntary. It was therefore within the court's discretion to admit them.

### B. Admission of Hassan's Statements

Ramsey contends the trial court erred in admitting Hassan's jailhouse statements because they were hearsay and no exception applied. Assuming for the sake of argument that Hassan's statements were inadmissible, any error was harmless.

Erroneous admission of hearsay evidence is prejudicial if it is reasonably probable the defendant would have achieved a more favorable result had the hearsay been excluded. (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619 [applying the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836].)

Here, Hassan stated that he, Wilkerson and Ramsey were at the victims' house, they intended to commit a robbery, and Ramsey fired a gun, all of which Ramsey admitted during his interrogation. These admissions and the DNA evidence placing Ramsay at the scene constituted strong evidence that he committed the charged crimes. We therefore conclude that even had Hassan's statements been excluded, it is not reasonably probable the jury would have returned a verdict more favorable to Ramsey.

## C.    The Racial Justice Act

Ramsey contends for the first time on appeal that admission of Hassan's jailhouse statements violated the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (Racial Justice Act) because the undercover law enforcement officer posing as a cellmate used the word "nigga" a few times in referring to Hassan, his accomplices, including Ramsey, and the victims.

The Racial Justice Act, Penal Code section 745,[1] provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) A violation of the statute occurs where, inter alia, "a law enforcement officer involved in the case . . . exhibit[s] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).)

---

[1] Undesignated statutory references are to the Penal Code.

A violation also occurs if, during trial, "the judge, an attorney in the case, a law enforcement officer involved in the case . . . use[s] racially discriminatory language about the defendant's race . . . or otherwise exhibit[s] bias or animus towards the defendant because of the defendant's race . . . .  This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case."  (§ 745, subd. (a)(2).)

Procedurally, an aggrieved party must timely file a motion pursuant to section 745 or "a petition for writ of habeas corpus or a motion under [s]ection 1473.7, in a court of competent jurisdiction." (§ 745, subd. (b).)

Ramsey contends that conducting an undercover operation targeting an African American inmate by using racial slurs violates section 745, subd. (a)(1), and introducing and admitting into evidence a recording from the undercover operation violates section 745, subd. (a)(2).

Respondent preliminarily argues Ramsey forfeited this claim by, as Ramsey concedes, failing to object below to Hassan's statements on the ground of racial bias.  Ramsey responds that if we conclude he forfeited this Racial Justice Act claim, his trial attorney rendered ineffective assistance by failing to raise the claim below.  We reach neither of these issues because in any event, no law enforcement officer, judge or attorney used racially discriminatory language about Ramsey's race or otherwise exhibited bias or animus toward him because of his race.

To prevail on a claim of racial bias, the defendant must prove a violation of section 745 by a preponderance of the evidence. (§ 745, subd. (a).)

Here, the context of the undercover officer's use of the word "nigga" shows it was intended to create rapport with Hassan rather than to "explicitly or implicitly appeal[ ] to racial bias."  (§ 745, subd. (h)(4).)  "Nigga is not an unambiguous racial epithet in today's

world, especially when used intraracially." (*Daniel v. Wayans* (2017) 8 Cal.App.5th 367, 390.)  The term " ' "can be an affectionate greeting, a compliment, or a term of respect." ' "  (*Id*. at p. 391.)  The undercover officer[2] used the word "nigga" with Hassan in a neutral if not friendly sense.  Nothing in the record shows Hassan interpreted the word as a racial insult or statement of racial bias or animus.

Ramsey thus could not have established at trial, and no factfinder reasonably could have found, that the officer used racially discriminatory language within the meaning of the Racial Justice Act or exhibited racial bias or animus toward even Hassan, much less Ramsey.

---

[2] Ramsey assumes the officer was Black, but the record does not reflect his race.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:


BENDIX, J.


WEINGART, J.